# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

<table>
<tr><td>
OWNER-OPERATOR<br>
INDEPENDENT DRIVERS<br>
ASSOCIATION, INC., HAROLD<br>
LANDRY, JIMMY HUX d/b/a<br>
HUX TRUCKING, RICHARD<br>
KERSHMAN, and LAUREL<br>
BARRICK, Individually and On Behalf<br>
of All Others Similarly Situated,<br><br>
    Plaintiffs/Appellants,<br><br>
VS.<br><br>
CONCORD EFS, INC., EFS<br>
NATIONAL BANK, FLYING J,<br>
INC., and PILOT CORPORATION,<br><br>
    Defendants/Appellees.
</td><td>
)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td><td>
**FILED**<br><br>
**February 29, 2000**<br><br>
**Cecil Crowson, Jr.**<br>
**Appellate Court Clerk**<br><br>
Appeal No.<br>
M1999-02560-COA-R3-CV<br><br>
Williamson Chancery<br>
No. 125387
</td></tr>
</table>

APPEALED FROM THE CHANCERY COURT
OF WILLIAMSON COUNTY AT
FRANKLIN, TENNESSEE

THE HONORABLE CORNELIA A. CLARK, CHANCELLOR

<table>
<tr><td>
FOR THE APPELLANTS:<br>
W. GARY BLACKBURN<br>
JOHN R. CALLCOTT<br>
Nashville, Tennessee<br><br>
PAUL D. CULLEN, SR.<br>
AMY IRENE WASHBURN<br>
Washington, DC
</td><td>
FOR THE APPELLEES<br>
CONCORD EFS, INC. and<br>
EFS NATIONAL BANK:<br>
J. RICHARD BUCHIGNANI<br>
DOUGLAS A. BLACK<br>
Memphis, Tennessee<br><br>
FOR APPELLEE FLYING J, INC.:<br>
J. O. BASS, JR.<br>
Nashville, Tennessee<br><br>
JONATHAN A. DIBBLE<br>
ERIC D. BARTON<br>
Salt Lake City, Utah<br><br>
FOR APPELLEE PILOT CORP.:<br>
ROBERT R. CAMPBELL<br>
AMY V. HOLLARS<br>
Knoxville, Tennessee
</td></tr>
</table>

AFFIRMED IN PART; REVERSED IN PART;
AND REMANDED

BEN H. CANTRELL,
PRESIDING JUDGE, M.S.

# O P I N I O N

    The primary question in this breach of contract case is whether the

plaintiff independent truckers were third-party beneficiaries of promises made

by the defendant truck stop owners to the defendant bank and the credit card

organizations that they would not add a surcharge to purchases. The trial court found that they were not third-party beneficiaries and granted summary judgment to the defendants. We believe, however, that as holders of credit cards issued by Visa and MasterCard, the truckers were intentional beneficiaries of the no-surcharge provisions in those contracts. We accordingly reverse the trial court's award of summary judgment to the defendant truck stop owners. We affirm the trial court in other respects, including its dismissal of claims by the truckers' organization.

## I. A CLASS ACTION LAWSUIT

Harold Landry, Jimmy Hux, Richard Kershman and Laurel Barrick were independent truckers who used credit cards issued by Visa and MasterCard to purchase diesel fuel at truck stop chains owned by two of the defendant companies. Contracts between the Visa and MasterCard organizations, the defendant bank, and the truck stop operators all provided that no surcharge would be imposed against users of the cards. Nonetheless, the truckers had to pay at least three cents more for each gallon of fuel than did customers who paid by other means.

The above named truckers are members of the Owner-Operator Independent Drivers Association (OOIDA). On April 7, 1998 OOIDA joined with them in a class action lawsuit to enjoin the practice of imposing a surcharge on the use of the credit cards. The individual truckers also asked for damages resulting from the practice. The plaintiffs' claims were based on the theory that they were third-party beneficiaries of the contracts in question. The defendants were truck stop operators Flying J and Pilot Corporation; EFS National Bank (EFSNB), which processes Visa and MasterCard charges for the truck stop operators; and Concord EFS, Inc., the parent company of EFSNB. Visa and MasterCard were not named as defendants.

The plaintiffs filed a Motion for Partial Summary Judgment on the issue of liability. They contended that as there was no dispute that the truck stop operators breached their contracts not to impose surcharges on credit card transactions, the cardholders were entitled to prevail. The defendants filed a Motion to Dismiss, arguing that since the plaintiffs were not parties to the contracts at issue, they had no standing to sue.

After two hearings and a vigorous struggle about discovery of contract documents (which continued even after the final order was filed), the trial court finally granted summary judgment to the defendants on all claims, and dismissed the plaintiffs' Motion for Partial Summary Judgment. The court agreed with the defendants that the plaintiff truckers association and the individual plaintiffs had no standing to sue, finding that they were not intended third-party beneficiaries of the contracts. The court also found that Concord EFS, as a parent corporation, could not be held liable for the actions of its subsidiary. This appeal followed.

## II. THE CREDIT CARD SYSTEM

It is not possible to discuss the contracts at issue without reference to the complex web of contractual obligations between banks, merchants, and individual cardholders which makes modern consumer credit possible. The structure of the system is something like a pyramid, with the credit card associations at the top. Only banks and other financial institutions are eligible for membership in the voluntary Visa and MasterCard associations.

The member banks, which number in the thousands, constitute the second level of the pyramid. The credit card associations recognize two kinds of members, each performing a different function within the system: issuing banks contract with customers such as the plaintiff drivers and issue credit cards

to them; acquiring banks, also known as merchant banks, process credit card transactions for merchants, such as Flying J and Pilot.

Hundreds of thousands of retail merchants make up the next level of the pyramid. When a cardholder uses his credit card to buy something from a merchant, the merchant must of necessity contact both an issuing bank and a merchant bank, for the issuing bank must approve the credit of the cardholder before the merchant bank can process the transaction through its electronic communications network.

The lowest level of the pyramid is made up of many millions of cardholders. When a cardholder desiring to make a purchase presents his card to a participating merchant, the merchant "swipes" the card through the point of sale device supplied by the merchant bank. The information on the card's magnetic stripe, together with information about the intended purchase, is transmitted to the Visa or MasterCard association, then to the issuing bank.

If the issuing bank approves the sale, an intricate sequence of electronic transactions is set into motion which involves the issuing bank, the Visa or MasterCard association, the merchant bank, and the merchant. Essentially, the merchant bank pays the merchant a discounted sum, and is subsequently reimbursed by the issuing bank, which makes payment through the credit card association. The issuing bank then bills the cardholder for the full amount of the transaction. The merchant bank, the issuing bank, and the credit card association each make a small profit from the sale, but action by the cardholder is necessary to both open and close the sequence of transactions.

### III. THE CONTRACTS

There are four separate contracts at issue in this case. The contracts between Visa and EFSNB (the merchant bank) and between MasterCard and EFSNB are both made up of several documents, including the by-laws and rules promulgated by the respective credit card associations. Both Visa and MasterCard prohibit surcharges. Rule 9.04 of the MasterCard rules demonstrates the comprehensiveness of the prohibition:

> **Charges to Cardholders.** The merchant shall not directly or indirectly require any MasterCard cardholder to pay a surcharge, to pay any part of any merchant discount, whether through an increase in price or otherwise, or to pay any contemporaneous finance charge in connection with the transaction in which a MasterCard is used. A surcharge is any fee, charged directly or indirectly, deemed by this corporation to be associated with the use of a MasterCard card that is not charged if another payment method is used.

The MasterCard rules further specify how the desired result is to be achieved:

> Because an issuer must be able to rely on certain basic terms in merchant agreements that affect the use of its MasterCard cards in interchange transactions, each merchant agreement must contain the substance of the prohibitions set forth in Rule 9.04(b) . . .

> Each member and each affiliate shall use its best efforts to cause each of its merchants to observe the provisions of the merchant agreement required by Rule 9.04(b) . . .

The MasterCard rules also state that "these rules are intended to be solely for the benefit of the Corporation [MasterCard] and its members." A similar provision is found in the Visa by-laws. However, the record shows that both organizations used several methods to notify consumers of the benefits of the no-surcharge provision, including publication of those provisions on their internet sites.

The contracts between EFSNB and Pilot, and between EFSNB and Flying J specifically reference the documents that make up the Visa-EFSNB and the MasterCard-EFSNB contracts, and require the merchants to comply with those contracts. They both also state that "Merchant . . . shall not impose any surcharge on transactions," and warrant that "each Sales Draft prepared and each transaction transmitted to EFSNB represents a valid obligation for the amount set forth therein, . . . and that there have been no services, carrying or any special charges or any special agreements, conditions or securities extracted in connection with the sale . . . ." It is undisputed that Pilot and Flying J charged more for fuel purchased with Visa and Mastercard than for fuel purchased by other means.

## IV. THE CARDHOLDERS AS THIRD-PARTY BENEFICIARIES

The law presumes that a contract has been executed solely for the benefit of those who are parties to it. Thus, the general rule is that an individual who is not a party to a contract cannot sue for its breach. However, the general rule gives way when a non-party can prove that he is an intended beneficiary of the contract. *First Tenn. Bank Nat'l Ass'n v. Thoroughbred Motor Cars, Inc.*, 932 S.W.2d 928, 930 (Tenn. Ct. App. 1996). A non-party who wishes to enforce a contract has the burden of proving that he is entitled to recover as a third-party beneficiary. *Moore Construction Co. v. Clarksville Dept. of Electricity*, 707 S.W.2d 1, 9 (Tenn. Ct. App. 1985).

The law draws a sharp distinction between an intentional beneficiary (who may maintain an action on the contract) and an incidental beneficiary (who may not). The fact that a party may reap a substantial benefit from the performance of a contract does not, in and of itself, entitle it to the status of an intentional beneficiary. *United American Bank of Memphis v. Gardner*, 706 S.W.2d 639 (Tenn. Ct. App. 1985). Rather, he must show that the contract was

entered into, at least in part, for that party's benefit (the "intent to benefit" test) or that one party to the contract assumed a duty that the other party owed to the third-party (the "duty owed" test). *Moore Construction v. Clarksville Dept. of Electricity, supra* at 9. The appellants contend that they satisfy both of these tests.

Although the intent to benefit test may sound as if it sets out a clear standard to follow, its application still begs the question of just what constitutes an intent to benefit. In attempting to answer the question, courts frequently find themselves having to apply definitions that suffer from an unhelpful circularity. The following excerpt from Restatement (Second) of Contracts § 302 (quoted in footnote 18, *Moore Construction Co. v. Clarksville Dept. of Electricity*, 707 S.W.2d 1, 9 (Tenn. Ct. App. 1985) serves as an example:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) *the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. . .* (emphasis added)

While acknowledging the validity of the general principles stated above, the court did not attempt to more precisely define how one determines what "the promisee intends," but concluded that ultimately, "[e]ach case must be decided on its own unique facts considered in light of the specific contractual agreements and the circumstances under which they were made." 707 S.W.2d at 10.

With respect to the merchants (Pilot and Flying J) we think that the truckers were clearly third-party beneficiaries of the merchants' contract with the

merchant bank. In that agreement the merchants said in effect, "We promise not to add a surcharge to purchases made with your credit cards." Only if the merchants now say "Well, we never intended to keep that promise" can they escape the conclusion that the benefit of the agreement was intended for the card holders. They do not insist that they were that cynical. We accordingly find that the truckers have standing to maintain this suit against Pilot and Flying J, and that the trial court erred in granting summary judgment to those defendants.

With respect to the merchant bank (EFSNB) its promise does not affect the cardholders so directly. Its promise to Visa and MasterCard was to "use its best efforts to cause each of its merchants to observe the provisions of the merchant agreement required by Rule 9.04(b)." Does that promise give the cardholders a right to sue the merchant bank for failing to prevent the merchants from adding a surcharge to credit card purchases?

We are convinced that the merchant bank's promise only incidentally confers a benefit on the cardholders. "Using my best efforts to prevent" another from adding a surcharge is a far different thing from the merchant's promise of "I will not add a surcharge." Therefore, we think the lower court properly granted summary judgment to the merchant bank. It follows that EFSNB's parent company, Concord EFS, was also entitled to summary judgment.

## V. THE STANDING OF THE OWNER-OPERATORS DRIVERS ASSOCIATION

The trial court explicitly found that aside from the question of third-party beneficiary status, OOIDA lacked standing to maintain a class action in its own name on behalf of its members, because it did not meet all three requirements set out for such standing in *Redbud Cooperative Corporation v. Clayton*, 700 S.W.2d 551 (Tenn. Ct. App. 1985).

As stated in *Redbud*, the three requirements a membership association must meet before it can maintain suit in its own name are (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. 700 S.W.2d at 556. The court correctly found that OOIDA met the first two requirements, but not the third.

We have already determined that the four OOIDA members have standing to sue in their own right. It is also apparent that OOIDA is seeking to protect the interests of its members. OOIDA is a national trade organization of independent truckers. Its members each drive on average more than 100,000 miles per year, and surcharges of even a few cents per gallon on the fuel they use can result in substantial monetary damages to their operations. Because of their geographic dispersion, it is difficult for members to pursue claims for relatively small sums of money. OOIDA has accordingly set up a department to help owner-operators collect funds rightfully due to them, and this department handles an average of 140 phone calls a day from members.

As appropriate as it may be for OOIDA to pursue claims on behalf of its individual members, it cannot maintain this suit without the participation of those members. In the *Redbud* case, the court ruled that a homeowner's association could maintain suit against residential developers who had negligently planned and executed a drainage system to carry rainwater away from the development. The developers themselves had incorporated the homeowner's association to own, maintain and control the common areas of the development for the benefit of the homeowners. Thus the homeowner's association could be considered an injured party when the development (including the common areas) repeatedly flooded.

The truck drivers' association cannot claim any similar relationship to the defendants, and it has not claimed any injury to itself, apart from the injury to its members. OOIDA is not mentioned in the contracts at issue, and cannot be considered a third-party beneficiary of those contracts. There are also no allegations in the record that it purchased gas from the defendants using Visa or MasterCard.

Although OOIDA lacks several ingredients required for standing, we see no obstacle to prevent it from continuing to support its members in their attempt to obtain redress. Our holding does not prevent the individual plaintiffs from seeking class certification "on behalf of all those similarly situated," whether members or non-members of OOIDA, nor does it prevent them from continuing to seek the same remedy OOIDA sought, an injunction, in addition to their damages.

## VII.

The trial court's grant of summary judgment to Flying J, Inc., and Pilot Corporation is reversed, and the claims of Harold Landry, Jimmy Hux, Richard Kershman and Laurel Barrick against those entities are reinstated. We affirm the summary judgment in favor of EFSNB and Concord EFS. Remand this cause to the Chancery Court of Williamson County for further proceedings consistent with this appeal. Tax one-half the costs on appeal to the Owner-Operator Independent Drivers Association, and one-half to Flying J, Inc., and Pilot Corporation.

_____
BEN H. CANTRELL,
PRESIDING JUDGE, M.S.

CONCUR:

_____
WILLIAM C. KOCH, JR., JUDGE


_____
WILLIAM B. CAIN, JUDGE

-11-